# United States Court of Appeals for the Federal Circuit

---

**UTTO INC.,**
*Plaintiff-Appellant*

**v.**

**METROTECH CORP., AKA VIVAX-METROTECH,**
*Defendant-Appellee*

---

2023-1435

---

Appeal from the United States District Court for the Northern District of California in No. 3:22-cv-01904-WHO, Judge William H. Orrick, III.

---

Decided: October 18, 2024

---

JAMES DENISON, Aliso Viejo, CA, argued for plaintiff-appellant.

JASON LAO, Haynes and Boone, LLP, Costa Mesa, CA, argued for defendant-appellee. Also represented by ANDREA LEVENSON.

---

Before PROST, TARANTO, and HUGHES, *Circuit Judges.*

TARANTO, *Circuit Judge.*

UTTO Inc. owns U.S. Patent No. 9,086,441, which describes and claims methods for detecting and identifying what the patent calls "buried assets," referring to underground utility lines.  UTTO sued Metrotech Corp., alleging infringement of the patent and tortious interference with prospective economic advantage under California law.  The district court dismissed both counts of the complaint for failure to state a claim on which relief can be granted.  Regarding patent infringement, we conclude that fuller claim-construction analysis and proceedings are needed in this case to determine the scope of the disputed claim language.  Regarding the state-law tort, we see no reversible error in the district court's dismissal. Accordingly, we vacate in part, affirm in part, and remand.

I

A

UTTO's '441 patent is titled "Detection of Buried Assets Using Current Location and Known Buffer Zones."  It describes variations on a process for detecting and identifying "buried assets (i.e., underground utility lines)," such as lines for telephones, electricity, natural gas, Internet, or wastewater pipes.  '441 patent, col. 1, line 45; *id.* lines 51–54.  The core of the process involves using both (a) a geographical location provider (*e.g.*, a global positioning system (GPS)) to pinpoint a person's location and (b) previously stored buried asset data to locate, and generate a buffer zone around, a buried asset; with that information, a field technician with a locator device is informed whether the technician is inside or outside the buffer zone for a particular asset.  *Id.*, col. 3, line 58, through col. 4, line 2.  The patent teaches, among other things, using the method in a way that reduces the possibility that the desired information about one buried asset is clouded by interfering signals from another.  *Id.*, col. 4, lines 2–10.  Independent claim 1 of the '441 patent reads:

A method on a mobile computing device for locating electromagnetic signals radiating from a buried asset, the method comprising:

*receiving*, via a communications network communicatively coupled with the mobile computing device, *a group of buried asset data points corresponding to a particular buried asset* sought by an operator of the mobile computing device;

reading a predefined value pertaining to a width of a buffer zone;

*generating, based on the group of buried asset data points, a two dimensional area comprising the buffer zone* at an above-surface location, wherein a width of the buffer zone corresponds to the predefined value, and wherein the buffer zone corresponds to the particular buried asset;

iteratively executing the following four steps:

a) calculating an above-surface location of the mobile computing device using spatial processes;

b) determining whether the above-surface location of the mobile computing device is located within the two dimensional area;

c) if the above-surface location is not located within the two dimensional area, displaying a first graphic in a display of the mobile computing device; and

d) if the above-surface location is located within the two dimensional area, displaying a second graphic in the display.

*Id.*, col. 17, line 48, through col. 18, line 16 (emphases added).

Metrotech, a competitor of UTTO's, sells its RTK-Pro locator device, which has a "walk back" feature. That

feature allows the device user to connect to a database and retrieve one or more location points previously saved in that database. When the user selects a point to "walk back" to, the RTK-Pro, having information about its own location, shows an arrow directing the user to that point. When the user (holding the device) is within 10 feet of the point, the screen shows a "zero-in" display that consists of a circle centered around the point and a symbol representing the user's location in relation to the point. Once the user reaches the center of the circle, the device confirms its arrival at the walk-back point and displays the point's coordinates.

B

On March 25, 2022, UTTO brought the present action against Metrotech, stating two counts in its complaint: infringement of the '441 patent and unfair competition. UTTO also moved for a preliminary injunction. Metrotech both opposed the motion for a preliminary injunction and sought dismissal of UTTO's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted. Before the district court could rule on either motion, UTTO filed a First Amended Complaint, alleging infringement and tortious interference with prospective economic advantage, and Metrotech sought dismissal of the new complaint.

On June 2, 2022, the district court denied the motion for a preliminary injunction. *UTTO Inc. v. Metrotech Corp.*, No. 22-cv-01904-WHO, 2022 WL 1814145, at *6 (N.D. Cal. June 2, 2022) (*UTTO Preliminary Injunction Denial*). In relevant part, the court held that UTTO failed to show a likelihood of success on the merits of its infringement claim. *Id.* at *3–5. In so concluding, the court set forth the claim construction that is the issue on appeal regarding the patent count of the complaint.

The court construed the claim language "group of buried asset data points" in both the "receiving" and

"generating" limitations of claim 1 to require "two or more" buried asset data points for *each* buried asset, adopting that construction as reflecting the "ordinary and customary meaning." *Id.* at *3–4. The court acknowledged that the specification in two places refers to "one or more buried asset data points" for a given buried asset, but the court said that those references to the singular occur "[o]nly twice" and "neither supports the ordinary reading of the claim language itself." *Id.* at *4. "Moreover," the court noted, "the figures showing the buffer zone generation (Figures 4A to 4G) all depict multiple data points." *Id.* The court also stated that it was not persuaded by UTTO's argument that a relevant artisan "would understand ['group of buried asset data points'] to 'encompass one data point if that were all that existed.'" *Id.* UTTO had contended that buried assets typically are power lines, water pipes, and telephone cables; that "it takes at least two points to define a line"; and that a relevant artisan would "understand the claim description to reflect that reality" and not to mean that the method did not work if there were only one data point. *Id.* The court suggested that this argument was self-defeating because, "if it takes at least two points to define a line," a relevant artisan would likely interpret the claim language "to mean more than one—in other words, 'two or more.'" *Id.* Because the '441 patent requires the use of "multiple points" to generate a buffer zone and Metrotech's "walk back feature requires only a single point," the district court concluded, UTTO had not shown a likelihood of success on the merits of its infringement claim. *Id.*

On July 8, 2022, the district court dismissed UTTO's First Amended Complaint, while granting UTTO leave to amend it. *UTTO Inc. v. Metrotech Corp.*, No. 22-cv-01904-WHO, 2022 WL 17968846, at *5 (N.D. Cal. July 8, 2022) (*UTTO First Dismissal*). As to patent infringement, the court determined that UTTO had not sufficiently pleaded facts about Metrotech's product that could meet the "receiving" or "generating" limitations. *Id.* at *3–4. For the

"receiving" limitation, the court relied on its claim construction from the *UTTO Preliminary Injunction Denial*, where it had construed "group of buried asset data points" to require two or more data points, and it concluded the amended complaint did not allege that Metrotech's device receives two or more data points for a particular buried asset. *Id.* at *3. For the "generating" limitation, the court drew the same conclusion. *Id.* at *4. The court also dismissed UTTO's claim of tortious interference with prospective economic advantage, concluding that UTTO had failed to allege several required elements of the tort. *Id.* at *4–5.

UTTO then filed a Second Amended Complaint, which Metrotech moved to dismiss under Rule 12(b)(6). On October 4, 2022, the district court dismissed that complaint, while again granting UTTO leave to amend. *UTTO Inc. v. Metrotech Corp.*, No. 22-cv-01904-WHO, 2022 WL 17968771, at *8 (N.D. Cal. Oct. 4, 2022) (*UTTO Second Dismissal*). As to patent infringement, the court ruled that UTTO had now plausibly alleged that the "receiving" limitation was met, based on a Metrotech video (which UTTO attached to its complaint) that plausibly showed a field technician retrieving multiple data points using Metrotech's locator device. *Id.* at *3–4. The court determined, however, that there still were no facts alleged that plausibly supported an inference that the "generating" limitation was met. *Id.* at *5. As to the state-law count, the court held that UTTO had not adequately alleged two elements of its tort claim: that there was an economic relationship between UTTO and a third party with the probability of future economic benefit to UTTO, *id.* at *6, and that Metrotech's conduct was independently wrongful, *id.* at *7.

In response to the second dismissal, UTTO filed a Third Amended Complaint, and Metrotech moved to dismiss it. On December 19, 2022, the district court dismissed UTTO's Third Amended Complaint—this time with prejudice.

*UTTO Inc. v. Metrotech Corp.*, 646 F. Supp. 3d 1180, 1191 (N.D. Cal. 2022) (*UTTO Final Dismissal*). As to patent infringement, the court, following its claim construction from its preliminary injunction denial, agreed with Metrotech that "the buffer zone described in the generating limitation is only generated using *multiple* buried asset data points," stating that the '441 patent describes the generation of a buffer zone from "the 'union' of circular two-dimensional areas surrounding buried asset data points." *Id.* at 1185 (emphasis added). After rejecting UTTO's doctrine-of-equivalents argument (a rejection not challenged by UTTO in this appeal), the district court determined that "[t]he inherent problem with UTTO's argument is that, as alleged, the walk back feature uses only one data point at a time and, as explained, the '441 Patent requires the use of multiple data points to generate the buffer zone." *Id.* at 1188. "As a result," the court concluded, "UTTO has not pleaded infringement, either directly or under the doctrine of equivalents." *Id.*

As to the state-law count, the district court determined that UTTO failed to state a claim of tortious interference with prospective economic advantage. *Id.* at 1188–91. The Third Amended Complaint makes the following allegations: A third party, Honeywell, considering the offering of locator services to its customers, expressed interest in using UTTO's software platform, possibly to run on Metrotech's hardware, for such an offering. J.A. 93–94 ¶¶ 46–47. Starting in October 2021, UTTO engaged in "continued negotiations," "several follow-up telephone calls," and discussion of the terms of a possible software-as-a-service agreement with Honeywell. J.A. 93 ¶ 46. Representatives of UTTO, Honeywell, and Metrotech met together on December 21, 2021, "at Honeywell's urging to see if Metrotech and UTTO could collaborate and whether data retrieved by Metrotech's physical devices could be UTTO compliant." J.A. 94 ¶ 47. According to UTTO, at the meeting,

> Mr. Burk [of Honeywell] asked if the Honeywell data Metrotech was storing could be delivered in a format that would work with the UTTO software. As understood by UTTO and others present, based on the conversations UTTO subsequently had with Honeywell representatives, Honeywell was aware that either UTTO or Metrotech could convert the data into a format that would work with UTTO's software. The inquiry was directed to whether converting data would be a mechanical process involving virtually no effort, or whether UTTO would have to be involved. Mr. Drew, speaking for Metrotech, said that it was not a question of whether Metrotech could provide UTTO compliant data and that of course it could, that Metrotech had that covered, strongly suggesting that UTTO was not necessary and that Metrotech knew how to handle anything UTTO could in the way of software. He said the question was whether Metrotech was willing to provide the data to UTTO and that, if it did, he would expect Metrotech would charge Honeywell extra. . . . Ms. O'Connor of Honeywell said, in words or substance, "Isn't that our data?" . . . Nevertheless, Metrotech's position was clear: Either Honeywell would have to abandon plans to contract with UTTO, or Honeywell would have to pay Metrotech an increased price if it wanted to work with UTTO, which Metrotech could determine as it saw fit since it had possession of the data, and so could it price UTTO out of the competition if it wanted to.

J.A. 94–95 ¶ 51 (omitting sentences immaterial to particular allegations now at issue on appeal). Mr. Drew, however, "had no reasonable basis" for making the

assertion "that Metrotech had the transfer of UTTO-compliant data 'covered,'" because "within a day or so of the December 21, 2021, meeting, [he] contacted [UTTO] seeking to obtain various details about UTTO's technical specifications and features, and these discussions indicated that Metrotech did not in fact have the level of software expertise Metrotech wanted to lead Honeywell to believe it had with regard to converting the data." J.A. 95–96 ¶ 52.

Reviewing those allegations, the district court dismissed the state-law count, without relying on one of the grounds of insufficiency that it recited in its previous dismissal—namely, that the asserted economic relationship alleged to have been interfered with (with Honeywell) was not sufficiently mature for purposes of this tort. *UTTO Final Dismissal*, at 1189. The court noted that UTTO had added allegations in the Third Amended Complaint "that further support the existence of an economic relationship between UTTO and Honeywell with the probability of future economic benefit to UTTO," but the court did not determine whether this element of the tort claim had now been adequately alleged. *Id.* Instead, the court concluded that UTTO had failed to plausibly allege that Metrotech's conduct was independently wrongful, a required element of the asserted tort. *Id.*

The court entered a final judgment of dismissal with prejudice on December 19, 2022. J.A. 1. UTTO timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II

UTTO challenges the district court's adoption of the construction of the "group" phrase—as requiring at least two data points per buried asset—in granting the motion to dismiss the patent count. Much more briefly, UTTO also challenges the district court's dismissal of its claim for tortious interference with prospective economic advantage. We address the two issues in turn.

10                                           UTTO INC. v. METROTECH CORP.

We decide the propriety of the dismissals de novo, following Ninth Circuit law, taking as true all well-pleaded allegations of material fact and construing them in the light most favorable to the nonmoving party. *See Sanderling Management Ltd. v. Snap Inc.*, 65 F.4th 698, 702 (Fed. Cir. 2023); *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017). Substantively, the Supreme Court has directed a federal court's inquiry under Rule 12(b)(6) to whether the factual allegations of the complaint are not merely consistent with but cross the line to support a plausible inference of liability under the invoked legal standard. *See Ashcraft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57, 570 (2007); *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, 698 (9th Cir. 2021); *K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282–83 (Fed. Cir. 2013). The proper claim construction and questions about intrinsic evidence are decided de novo, but "[s]ubsidiary fact-finding" based on extrinsic evidence is sometimes useful, and such fact-finding is "subject to appellate review for clear error." *ParkerVision, Inc. v. Qualcomm Inc.*, ___ F.4th ___, 2024 WL 4094640, at *10 (Fed. Cir. Sept. 6, 2024); *see Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326–27, 331–33 (2015).

A

Regarding patent infringement, we agree in part with UTTO. We do not agree that claim construction is categorically forbidden at the Rule 12(b)(6) stage of a case. But we agree that, in this case, additional analysis and proceedings are needed to arrive at a proper construction.

1

UTTO argues that a district court may never engage in claim construction in deciding a motion to dismiss. It relies on portions of our opinion in *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), in which we reversed a district court's dismissal of patent-infringement claims as

resting on a premature resolution of claim-construction disputes. One portion, which uses the familiar label for claim-construction proceedings based on *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), states:

> Defendants' objections to [plaintiff Nalco's] theory of infringement read like classic *Markman* arguments. Defendants first take issue with Nalco's allegation that "coal combustion flue gas" is "the gas that is created during the combustion of coal." But Defendants' arguments boil down to objections to Nalco's proposed claim construction for "flue gas," *a dispute not suitable for resolution on a motion to dismiss*.

*Nalco*, 883 F.3d at 1349 (emphasis added) (citation omitted). Another portion states:

> It is not appropriate to resolve these disputes, or to determine whether the method claimed in the '692 patent should be confined to the preferred embodiment, on a Rule 12(b)(6) motion, without the benefit of claim construction. The "purpose of a motion to dismiss is to *test the sufficiency of the complaint, not to decide the merits*." *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (emphasis added) (citation omitted). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the plaintiff's allegations. *Twombly*, 550 U.S. at 556 . . . .

*Id.* at 1350.

Those passages, we conclude, should not be read as stating a categorical rule against a district court's adoption of a claim construction in adjudicating a motion to dismiss. The passages do not in terms state such a rule. They are readily understood to be drawing a conclusion about the

need for further proceedings to resolve the particular claim-construction issues in that case before a sound determination of the appropriateness of dismissal could be reached. *Nalco* should be read in that case-specific way.

Doing so reflects the logical relationship of claim construction to infringement and the normal function of courts deciding whether to grant a Rule 12(b)(6) motion. Adjudicating a claim of infringement generally requires a two-step analysis: "[T]he court first determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device (for an apparatus claim) or allegedly infringing act (for a method claim)." *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022) (citing *CommScope Technologies LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021)). "The first step— claim construction—is a question of law we review de novo to the extent it is decided only on the intrinsic evidence." *Id.* at 1351 (first citing *Data Engine Technologies LLC v. Google LLC*, 10 F.4th 1375, 1380 (Fed. Cir. 2021); and then citing *Teva*, 574 U.S. at 331). In many cases, claim construction is properly done based on intrinsic evidence alone. *See Teva*, 574 U.S. at 331 (recognizing that claim construction "often requires the judge only to examine and to construe the document's words without requiring the judge to resolve any underlying factual disputes"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."). Where claims are construed based on intrinsic evidence alone, a decision on claim construction is not different in kind from the interpretation of other legal standards, which is proper and routine in ruling on a motion under Rule 12(b)(6).

UTTO's proposed categorical rule would also be inconsistent with our precedents. For example, in the context of challenges to eligibility under 35 U.S.C. § 101,

we have repeatedly approved the grant of a motion to dismiss a patent suit "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Simio, LLC v. FlexSim Software Products, Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)); *see, e.g.*, *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1289–90 (Fed. Cir. 2024); *Aatrix*, 882 F.3d at 1125 (citing precedents). The application of eligibility standards depends on what is claimed—that is, on the meaning of the claims—and thus requires the court to interpret the claims. *See, e.g.*, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768–69 (Fed. Cir. 2019); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); *see also Brumfield, Trustee for Ascent Trust v. IBG LLC*, 97 F.4th 854, 868 (Fed. Cir. 2024) (analyzing eligibility based on the "claims, understood in light of the specification"); *Sequoia Technology, LLC v. Dell, Inc.*, 66 F.4th 1317, 1320, 1323–26 (Fed. Cir. 2023) (reversing ineligibility ruling based on reversal of claim construction).

As to the scope of necessary proceedings: We have explained that a tribunal need not construe all claim terms whose meaning is in dispute, but may limit itself to those terms whose meaning must be determined to adjudicate the matter in issue, such as infringement or invalidity. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019); *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). In addition, we have said that district courts have "wide latitude in how they conduct the proceedings before them," including claim-construction proceedings. *Ballard Medical Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001). "[S]ome courts have found it useful to hold hearings and issue orders comprehensively construing the claims in issue," but "[s]uch a procedure is not always necessary." *Id.* "As long as the trial court construes the claims to the extent necessary to determine

whether the accused device infringes, the court may approach the task in any way that it deems best." *Id.* Similarly, in the § 101 context, we have explained: "If there are claim construction disputes at the Rule 12(b)(6) stage, we have held that either the court must proceed by adopting the non-moving party's constructions, or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Aatrix*, 882 F.3d at 1125 (citations omitted) (citing *Genetic Technologies Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016)). And in challenges on appeal, we have repeatedly faulted the appellant for not having "explained how it might benefit from any particular term's construction." *Simio*, 983 F.3d at 1365; *see also Mobile Acuity*, 110 F.4th at 1293–94; *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023); *Electronic Communication Technologies, LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183–84 (Fed. Cir. 2020); *Cleveland Clinic Foundation v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). Finally, while recognizing that "extrinsic evidence and expert testimony can help to educate the court concerning the invention and the knowledge of persons of skill in the field of the invention, even as we have cautioned against undue reliance on experts," we have said that "[t]he decision as to the need for and use of experts is within the sound discretion of the district court." *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357 (Fed. Cir. 2006) (citation omitted) (citing *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

The foregoing authorities make clear that there is no procedural error in the mere fact that a court has construed claims without conducting a separate *Markman* claim-construction set of proceedings, much less without hearing extrinsic evidence or expert testimony. Some case-specific circumstances can make it improper for a district court to resolve a claim construction dispute in the context of

adjudicating a Rule 12(b)(6) motion, but sometimes a claim's meaning may be so clear on the only point that is ultimately material to deciding the dismissal motion that no additional process is needed. *Nalco* does not establish a rigid rule in place of the practical, case-specific inquiry.

2

In this case, we conclude, fuller claim-construction proceedings and analysis are needed than were provided in and by the district court. The claim limitation at issue is "generating, based on the group of buried asset data points, a two dimensional area comprising the buffer zone." '441 patent, col. 17, lines 58–59. The language, "*the* group of buried asset data points" (emphasis added), refers back to the claim limitation, "receiving . . . a group of buried asset data points corresponding to a particular buried asset sought by an operator of the mobile computing device." *Id.*, lines 51–55. The issue in dispute is whether "a group of buried asset data points corresponding to a particular buried asset" must consist of at least two data points. The district court gave an affirmative answer in denying the preliminary injunction and did not change that answer in its rulings on the three dismissal motions. We conclude that the analysis supporting that answer is inadequate.

As a threshold matter, we see no forfeiture of the opportunity to present additional claim-construction analysis and evidence and no missing explanation of how additional proceedings could matter to the result. In its Third Amended Complaint, UTTO alleged that "[a] 'group' in the mathematical or computing sense of the word could refer to a single set of data upon which operations are performed." J.A. 91 ¶ 32. In opposing dismissal of the Third Amended Complaint, UTTO indicated its intent to present additional materials for claim construction at an upcoming proceeding pursuant to the established schedule for claim construction (which the district court did not abrogate or alter): "Particularly since the claim construction hearing is scheduled to take place in a month,

UTTO respectfully urges that the Court avoid premising its ruling on Metrotech's claim construction until all the relevant claim construction evidence is considered." J.A. 158–59. By that point, UTTO and Metrotech had already filed a joint claim-construction and prehearing statement. *See UTTO Inc. v. Metrotech Corp.*, No. 22-cv-01904-WHO (N.D. Cal. Oct. 24, 2022), ECF No. 40; J.A. 75. In it, UTTO pointed to several pieces of extrinsic evidence that it sought to present at further proceedings, including encyclopedia articles on "group theory" and "group," the testimony of its founder, and the testimony and report of an expert. *Id.* at 2–4. Subsequently—and before the district court ruled on the final motion to dismiss—UTTO also filed an opening claim-construction brief elaborating on its legal arguments and extrinsic evidence. *UTTO Inc. v. Metrotech Corp.*, No. 22-cv-01904-WHO (N.D. Cal. Dec. 8, 2022), ECF No. 59; J.A. 76. And there was never doubt in the district court that the correctness of the "at least two" construction was crucial to the district court's basis for dismissing the patent count of the complaint.

On the merits, the basic framework for claim construction is familiar. "We generally give words of a claim their ordinary meaning in the context of the claim and the whole patent document; [and] the specification particularly, but also the prosecution history, informs the determination of claim meaning in context, including by resolving ambiguities"; but "even if the meaning is plain on the face of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition." *K-fee System GmbH v. Nespresso USA, Inc.*, 89 F.4th 915, 919 (Fed. Cir. 2023) (alteration in original) (first quoting *World Class Technology Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014); and then citing *Personalized Media Communications, LLC v. Apple Inc.*, 952 F.3d 1336, 1339–40 (Fed. Cir. 2020)); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc); *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d

1362, 1365 (Fed. Cir. 2012). Within that framework, we see several issues relevant to a proper claim construction that would significantly benefit from fuller exploration by the parties and the district court.

We have previously exercised our discretion not to resolve a claim-construction dispute ourselves, but instead to remand for further proceedings on the dispute, where "[t]here has been insufficient exploration in the record, both here and in the district court, of too many questions of apparent relevance to identifying a proper construction of the limitation." *Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 721 (Fed. Cir. 2014) (first citing *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008); and then citing *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1270 n.8 (Fed. Cir. 2013)). We explained that those questions "would be better addressed initially by more focused analysis—and, if necessary, more focused record development—on remand." *Id.* at 722. This is such a case. We flag the issues, leaving for remand the needed additional examination of the case-specific materials and of governing claim-construction precedents.

The district court had good reason to start with the premise that the phrase "group of buried asset data points," in its most usual meaning in ordinary parlance, calls for two or more such points. But UTTO raises at least a question as to whether a relevant artisan would read the phrase in light of a recognized meaning of "group" in mathematics to mean one or more, not two or more. And even aside from that possibility, which we do not explore further, there are reasons for more analysis before deciding whether the phrase should be assigned the two-or-more meaning.

For one thing, the claim language does not appear to be the kind of language that has so "plain" a univocal meaning that to give it a contrary construction would require meeting the high standard of redefinition or clear

disclaimer. *See K-fee*, 89 F.4th at 919. Otherwise, speaking of a "group of one or more" would be not just unusual but flatly impermissible as English because it would be self-contradictory—like (say) "pair of one or more." Yet it does not seem to have that character. *See IEX Corp. v. Blue Pumpkin Software, Inc.*, 122 F. App'x 458, 465 (Fed. Cir. 2005) (using phrase "group of *one or more* agents" without noting linguistic impropriety); *cf. AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18, 19 (Fed. Cir. 2023) (same for term "set"; involving a claim limitation of "a *set* of one or more" items) (emphasis added).

Relatedly, to the extent that "group of [plural term]" shares the character of plurals, the proper meaning is presumptive, but only presumptive—the specification not having to rise to the level of redefinition or disclaimer to overcome the presumed "two or more" meaning. In accordance with ordinary and customary meaning, we have stated that "we presume a plural term refers to two or more items," but "[t]hat presumption can be overcome when the broader context shows a different meaning applies." *Apple Inc. v. MPH Technologies Oy*, 28 F.4th 254, 261–62 (Fed. Cir. 2022) (citing *Leggett & Platt, Inc. v. Hickory Springs Manufacturing Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002)). "[I]n context, the plural can describe a universe ranging from one to some higher number, rather than requiring more than one item." *Versa Corp. v. Ag-Bag International Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004). If the plural expression "buried asset data points" inside the claim expression "group of buried asset data points" can mean "one or more buried asset data points," the claim expression would refer to "group of one or more buried asset data points"—which, as noted above, seems linguistically permissible though unusual. Thus, the analysis of the claim term's proper meaning must go beyond a conclusion about the "ordinary and customary meaning" of the words. *UTTO Preliminary Injunction Denial*, at *3 ("The claim does not mention 'one or more' data points, or 'a' data point. It describes a 'group' of 'data

points,' plural.  The ordinary and customary meaning indicates that more than one data point is necessary to create the buffer zone.").  The specification must play a central role in arriving at a proper construction here, as it generally does.  *See, e.g., Phillips*, 415 F.3d at 1315–17.[1]

When we turn to the specification of the '441 patent, we see seeming support for UTTO's proposed claim construction as including one or more.  Two passages mention the use of the claimed method in conjunction with "one or more" buried asset data points.  First, in discussing how various types of data for a buried asset may be generated and stored in a database, the specification states that the database "may store one or more records for each buried asset, and each record may include one or more buried asset data points."  '441 patent, col. 5, lines 58–66.  Second, the specification states that, "[b]ased on the data [that the locator device] has received and calculated, [the locator device] calculates one or more buried asset data points . . . for the target buried asset."  *Id.*, col. 9, line 67, through col. 10, line 2.  We add that, in a third passage (cited by Metrotech but warranting more attention than so far given by the parties), the specification seemingly describes a single-point-based buffer zone (as well as a multi-point-based one): It says that Figure 4C "shows that a circular two-dimensional area comprising a buffer zone has been created around each buried asset data point, wherein the union of all of the circular two-dimensional areas comprises the buffer zone around the buried asset data points."  '441 patent, col. 12, lines 16–20.  The first clause seems to treat the area defined by the circle around a single point as a buffer zone (and the union of such buffer zones as itself a buffer zone).

---

[1]  The parties have not presented arguments to us focused on prosecution history as illuminating claim scope.

The foregoing passages require close scrutiny. On their face, they seem to lend support to the idea that the invention described covers a technician's use of a single circular buffer zone around a single data point corresponding to a utility line—perhaps when the technician cares about only a small area, *e.g.*, immediately abutting a house, not a large area extending along the line. The passages may illuminate the proper claim interpretation, including by identifying the invention's "purpose." *See, e.g.*, *Honeywell International, Inc. v. United States*, 609 F.3d 1292, 1302 (Fed. Cir. 2010) (relying on patent-disclosed "purpose"); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) (same); *Minnesota Mining & Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566–67 (Fed. Cir. 1992) (same).

The district court, in its preliminary-injunction decision, stated that "[o]nly twice" does the specification refer to the use of "one or more buried asset data points" and that "neither [reference] supports the ordinary reading of the claim language itself." *UTTO Preliminary Injunction Denial*, at *4. But it is not clear why twice is not enough to support what may be a permissible, if unusual and non-presumptive, meaning of the expression. The court also said that "the figures showing the buffer zone generation (Figures 4A to 4G) all depict multiple data points." *Id.* That is true, but the court's statement does not assert that the figures depict *only* buffer zones based on more than one data point, and the above-quoted specification passage from col. 12, lines 16–20, seemingly does describe a "buffer zone" (in Figure 4C) as based on a single data point (along with a broader buffer zone based on more than one data point). More broadly, the specification never uses "the present invention requires" or similarly limiting language when referring to depicted embodiments; in fact, it appears to be meticulous in describing embodiments as mere examples. *See* '441 patent, col. 3, lines 48–57; *see, e.g.*, *id.*, col. 11, lines 32, 65;

col. 12, lines 1, 23, 32, 55, 64–65; col. 13, line 23; col. 14, lines 16, 66.

Finally, on remand, there may be a role for extrinsic evidence to play in this case in recognized ways, including in coming to understand the invention as disclosed. *See, e.g.*, *Inpro II Licensing*, 450 F.3d at 1357. Here, for example (not necessarily only), extrinsic evidence may help to assess Metrotech's argument that there is no indication that the '441 patent allows the operator to turn off the functions performed on data points and then to work with only a "portion" of the data points retrieved. Metrotech Response Br. at 26–27. UTTO has alleged, including in its Third Amended Complaint, that its invention does work with one data point. J.A. 87 ¶ 19 (alleging that the '441 patent can work with a "portion" of the data points retrieved and "can operate on each data point retrieved individually"). That assertion is a non-conclusory factual one under the standards governing Rule 12(b)(6), *Twombly*, 550 U.S. at 555, but to the extent it bears on claim construction, the district judge may adjudicate its correctness through adequate proceedings and must decide what role it should play in drawing the ultimate legal conclusion of the proper claim construction, *see Teva*, 574 U.S. at 331–33.

We vacate the district court's dismissal of UTTO's infringement claim and remand for further claim-construction proceedings. We do not here decide whether the district court's claim construction is correct.

B

A claim for intentional interference with prospective economic advantage under California law requires a showing of the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the

relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 63 P.3d 937, 950 (2003) (quoting *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521–522, 49 Cal. Rptr. 2d 793, 802 (1996)). In addition, the plaintiff must show that "the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.'" *Id.* (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393, 902 P.2d 740, 751 (1995)). The district court dismissed the Third Amended Complaint because it determined that UTTO had failed to plead that Metrotech's conduct was independently wrongful. *UTTO Final Dismissal*, at 1189–91.

On appeal, UTTO argues that Metrotech's conduct was independently wrongful in two respects: Metrotech unlawfully tied its relocating software product to its hardware product, and Metrotech fraudulently misrepresented its software capabilities. UTTO Opening Br. at 24–26. We conclude that UTTO's brief assertions on appeal on this issue are insufficient to support disturbing the district court's dismissal.

With respect to tying: UTTO argues that it "alleged that the relocating software market consisted of two participants, UTTO and Metrotech, and that Metrotech had been eliminating its sole competitor from that market by tying Metrotech's hardware product to Metrotech's relocating software and the 'Walk Back' feature." *Id.* at 25. The only legal authority that UTTO cites in support of this argument in its opening brief is a portion of a Ninth Circuit case where the court discusses a tie that is unlawful under a modified *per se* rule. *Id.* at 25–26 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 681 (2024), *and cert. denied*, 144 S. Ct. 682 (2024)); *see also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S.

28 (2006). Accordingly, we construe UTTO's contention to be that Metrotech has tied its product in a way that is *per se* unlawful (as opposed to a tie that is unlawful under a Rule of Reason analysis).[2]

To state a claim for a tie that is *per se* unlawful, a plaintiff must adequately allege, among other things, that the defendant has market power in the tying-product market. *See Epic Games*, 67 F.4th at 997. Here, UTTO is asserting that the hardware market is the tying-product market and the software market is the tied-product market. UTTO Opening Br. at 25. But, although UTTO has alleged facts supporting an inference that Metrotech has market power in the software market, *i.e.*, the tied-product market, J.A. 94 ¶ 50, it has failed to allege that Metrotech has market power in the hardware market, *i.e.*, the tying-product market. That deficiency is enough to hold that tying has not been adequately alleged, though there may well also be other deficiencies—such as, perhaps, the absence of an allegation of a Metrotech policy beyond the dealing with one customer described by UTTO. J.A. 93–97 ¶¶ 44–58.

With respect to the alleged fraud: UTTO asserts that it alleged that Metrotech "made false representations about its [software] capabilities" to disrupt UTTO and Honeywell's dealings. UTTO Opening Br. at 24–25; *see* J.A. 94–96 ¶¶ 51–55. The sole basis for the allegation is that Metrotech's representative assertedly stated during the December 21, 2021 meeting with Honeywell and UTTO that "it was not a question of whether Metrotech could

---

[2] UTTO adds a "see also" citation to *Epic*'s reference to an "incipient violation of an antitrust law," 67 F.4th at 1000, but there is no developed argument on the point, so we disregard it. *See Game and Technology Co., Ltd. v. Wargaming Group Ltd.*, 942 F.3d 1343, 1350–51 (Fed. Cir. 2019).

provide UTTO compliant data and that of course it could, that Metrotech had that covered," J.A. 94–95 ¶ 51, yet the same Metrotech representative called UTTO within a day or so of the December 21, 2021 meeting asking for "various details about UTTO's technical specifications and features," J.A. 95–96 ¶ 52. On that basis alone, UTTO alleges that Metrotech made "false and misleading statements about its software capabilities," J.A. 96 ¶ 55, violating the prohibition against fraudulent business acts or practices under California's Unfair Competition Law, California Business & Professions Code § 17200. *Id.*; UTTO Opening Br. at 26.

We agree with the district court's conclusion that this allegation is insufficient to escape dismissal. UTTO has not stated facts that spell out a plausible allegation that Metrotech's statement was fraudulent under the Unfair Competition Law. A follow-up communication to ask for technical specifications before converting data does not allow the drawing of a reasonable inference that Metrotech would not be able to provide the data in a compliant format, once it had the knowledge of UTTO's technical specifications—which a follow-up call was the first step in acquiring. In other words, UTTO has not alleged facts that would "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also id.* at 557 (discussing "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" the alleged violation of law).

We therefore discern no reversible error in the district court's dismissal of UTTO's state-law claim.

## III

We vacate the district court's dismissal of the claim of patent infringement and remand for further proceedings consistent with this opinion. We affirm the district court's dismissal of the claim of tortious interference with prospective economic advantage.

The parties shall bear their own costs.

## VACATED IN PART, AFFIRMED IN PART, AND REMANDED